David E. Schwartz
Risa M. Salins
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Telephone: (212) 735-3000
Facsimile: (212) 735-2000

Attorneys for Plaintiff

**JUDGE KARAS**

**15 CV 3613**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

INSYS THERAPEUTICS, INC.,

                        **Plaintiff,**

         - against -

MICHAEL FERRARO,

                        **Defendant.**

    ___ Civ. _____

    **COMPLAINT**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

      Plaintiff Insys Therapeutics, Inc. brings this Complaint against Defendant Michael Ferraro, and in support thereof states, as follows:

**PARTIES**

      1.      Plaintiff INSYS THERAPEUTICS, INC. ("Insys" or the "Company") is a Delaware corporation with its principal place of business in Chandler, Arizona. Insys Therapeutics, Inc. operates through its wholly-owned subsidiary Insys Pharma, Inc., a Delaware corporation with its principal place of business in Chandler, Arizona. These entities report earnings on a consolidated basis.

2.     Upon information and belief, Defendant MICHAEL FERRARO ("Ferraro") is a resident of Bethel, Connecticut, and may be served with process by service at his residence, 20 Cortland Drive, Bethel, Connecticut 06801.

## JURISDICTION AND VENUE

3.     This Court has jurisdiction in this Action under 28 U.S.C. § 1332(a) because Plaintiff is a citizen of Delaware and Arizona and Defendant is a citizen of Connecticut, and because the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

4.     Venue is proper in this District because a substantial part of the events giving rise to the claims took place in the Southern District of New York and Defendant is subject to personal jurisdiction in the Southern District of New York. *See* 28 U.S.C. § 1391.

## PRELIMINARY STATEMENT

5.     Plaintiff Insys is a specialty pharmaceutical company that develops and commercializes innovative supportive care products.

6.     Defendant was previously employed by Insys in a sales and training position.

7.     During his employment with Insys, Defendant improperly (a) participated in an outside compounded pain cream business, in conflict with the interests of the Company, without the Company's authorization and (b) leveraged and exploited his health care provider ("HCP") connections, which were established through his

employment at Insys, to encourage such HCPs to prescribe pain creams for his own personal gain.

8.     These unauthorized activities violated several Company policies and Ferraro's contractual obligations, as well as Ferraro's common law obligations as a full-time employee, agent and fiduciary of Insys.

9.     Defendant has been terminated for Cause in connection with his improper and unauthorized conduct.

## FACTS

### *Insys's Background*

10.     Among other commercial endeavors, Insys currently develops and markets Subsys, an opioid agonist indicated for the management of breakthrough pain in cancer patients 18 years of age and older who are already receiving and who are tolerant to opioid therapy for their underlying persistent cancer pain.   Patients must remain on around-the-clock opioids when taking Subsys.   Subsys is a transmucosal immediate-release fentanyl (TIRF) product that delivers fentanyl, an opioid analgesic, for transmucosal absorption underneath the tongue.

11.     Insys promotes Subsys using a highly targeted approach designed to maximize impact with HCPs who are TIRF Risk Evaluation and Mitigation Strategy (REMS) enrolled.   Enrollment in the TIRF-REMS program is required by the FDA as of March 2012 in order to prescribe TIRF products.

12.     Insys employs District Sales Trainers who are responsible for assisting with the execution and delivery of training curriculum as it relates to the technical,

product and medical knowledge of Specialty Sales Professionals (i.e. sales representatives). District Sales Trainers also assist with implementing programs that will enable the field to achieve performance and sales objectives.

13.     Insys has spent a significant amount of time and money over the last several years in training its sales force and educating a network of HCPs that prescribe Insys products on the clinical benefits of its products. As the medical community has increasingly grown to understand Subsys's unique clinical attributes and potential benefits to patients, sales of Subsys have continually increased since its commercial launch in March 2012 and the Company's sales organization and infrastructure have grown significantly over the past several years. During this period, the Company has also expended a great deal of time and money on obtaining prescription and market data, and market research studies related to Subsys.

14.     Like their peers in the pharmaceutical industry, Insys sales professionals can receive significant compensation if they properly and effectively perform their position.

15.     Upon its launch in March 2012, Subsys was the sixth entrant into the existing TIRF market. Accordingly, the Company's sales and marketing efforts have primarily targeted the top physicians prescribing the existing TIRF products that preceded Subsys in the market. These efforts have been very successful and many of the top physician prescribers in the TIRF-REMS program prescribe Subsys for their patients. Insys's sales approach has resulted in Subsys having the highest market share percentage of any TIRF product.

*Insys Policies and Agreements*

16.     Policy 110 (Conflict of Interest), contained in the Insys Handbook for New Employees, requires that: "Employees should always act in the best interest of INSYS . . . and not permit outside interests to interfere with their job duties. This policy prohibits all employees from using their position with INSYS or relationships with INSYS clients, customers, physicians, patients, vendors, suppliers, contractors or advisors for private gain or to obtain benefits for themselves or members of their family. Employees have an obligation to conduct business within guidelines that prohibit actual or potential conflicts of interest.  . . . For purposes of this policy, a potential or actual 'conflict of interest' occurs when an employee's outside interests (for example, financial or personal interests) interfere with the interests of INSYS or the INSYS employee's work-related duties or when an employee is in a position to influence a decision that may result in a personal gain for that employee or for a relative. . . If you become aware of any potential conflict of interest or ethical concern regarding your employment or another employee at INSYS, you must promptly speak to, write or otherwise contact the head of INSYS Human Resources Department (or the head of the Compliance or Legal Departments), as soon as possible."

17.     During the period in which Ferraro was employed, Policy 111 (Outside Employment), contained in the Insys Handbook for New Employees, required and read as follows: "Employees are required to obtain written approval from their supervisor before participating in outside work activities.  Approval will be granted unless the activity conflicts with the Company's interest.  In general, outside work activities are not

allowed when they:  Prevent the employee from fully performing work for which he or she is employed at the Company, including overtime assignments; Involve organizations that are doing or seek to do business with the Company, including actual or potential vendors or customers; or Violate provisions of law or the Company's policies or rules."

18.     All employees are provided with a copy of the Insys Handbook for New Employees, which includes Policy 110 (Conflict of Interest) and Policy 111 (Outside Employment), upon commencement of employment. A copy of the Insys Handbook for New Employees is readily available and accessible on the Company's information website.

19.     Under the Insys Proprietary Information and Inventions Assignment Agreement (the "Proprietary Agreement"), Insys employees agree, as a condition of employment with the Company, among other things, that they will not, either directly or indirectly: (a) at any time, use or disclose Insys's proprietary information which includes information regarding customers, or (b) engage in any employment or business activity that would conflict with their employment at the Company without the Company's express written consent.

20.     The Insys Therapeutics Confidential Information Policy (the "Confidentiality Agreement") provides that, among other things, (a) Insys employees must not use or disclose Insys's confidential information, except within the scope of employment, (b) Insys employees must surrender all Company documents and information upon termination of employment, and (c) obligations under the Confidentiality Agreement continue after employment with the Company has ended.

21.     All Insys employees are required to review, acknowledge and agree to these policies and contracts.

22.     In his Employment Offer Statement ("Offer Statement"), Ferraro agreed that "during [his] employment and for a period of 9 months thereafter, within a 50-mile radius of any territory held during [his] employment, [he would] not, directly or indirectly (iii) solicit or attempt to solicit any customer to which the Company sold any product or performed any service ("Customer") during the one (1) year period prior to the termination of [his] employment with the Company or (iv) provide products or services directly competitive with a product or service of the Company to any Customer."

### Defendant's Employment with Insys

23.     On July 3, 2014, Ferraro was offered and accepted employment with Insys. He started work on August 11, 2014 as a Specialty Sales Professional and District Sales Trainer, BOS-109E White Plains, NY.   Ferraro's territory included the New York counties of Albany, Bronx, Columbia, Dutchess, Kings, New York, Orange, Rensselaer, Rockland, Schenectady, Ulster, and Westchester, as well as New Haven and Fairfield County in Connecticut. Upon information and belief, for two years prior to his employment with Insys, Ferraro was employed by a pharmaceutical company in a sales and management role.

24.     On August 11, 2014, Ferraro entered into the Proprietary Agreement.

25.     On August 11, 2014, Ferraro executed the Confidentiality Agreement.

26.    On August 11, 2014, Ferraro also acknowledged receipt of the Insys Handbook for New Employees and agreed to comply with the policies contained in the handbook.

27.    Ferraro was hired to open a new sales territory for the Company. The Company provided Ferraro with a list of HCPs in the TIRF-REMS program in his territory. As a result, for many, if not all, HCPs in his territory, Ferraro was their first introduction to the Company and its products.

28.    Ferraro was paid a base salary and bonuses throughout his employment. He also received a stock option award pursuant to the Insys Therapeutics, Inc. 2013 Equity Incentive Plan ("Equity Plan").

29.    Under the Equity Plan, upon termination of employment for Cause, stock option awards terminate immediately and the exiting employee is prohibited from exercising them from and after the date of termination for Cause.  Cause includes the occurrence of, among other things, any of the following events:

> ...(ii) participation (whether by affirmative act or omission) in a fraud or felonious act against the Company and/or its Affiliates, (iii) conduct which, based upon a good faith and reasonable investigation by the Company, demonstrates unfitness to serve, (iv) violation of a statutory or fiduciary duty, or duty of loyalty owned to the Company and/or its Affiliates and which has a material adverse effect on the Company and/or its Affiliates...(vi) breach of any material term of any contract, or (vii) violation of any material Company policy.

30.    The Option Agreement under the Equity Plan also provides that the term of the option expires immediately upon termination for Cause and cannot be exercised thereafter.

31.     Ferraro's employment with Insys was terminated for Cause effective April 23, 2015, as a result of his blatant and significant violations of Policy 110 (Conflict of Interest) and Policy 111 (Outside Employment), his obligations under the Offer Statement, Proprietary Agreement and the Confidentiality Agreement and his common law obligations as a full-time Insys employee and fiduciary.

### *Defendant's Misconduct*

32.     In October 2014, Insys received a report from a newly hired Specialty Sales Professional that she believed Ferraro was actively working for a company that sold compounded pain creams.

33.     Upon learning of Ferraro's possible outside business activities, Insys asked Ferraro whether he was, in fact, engaged in such sales activities.  At that time, Ferraro denied that he was actively selling compounded pain creams.  Other Insys employees who were involved in this outside business either resigned or were terminated in connection with this unauthorized activity.

34.     On April 9, 2015, after a field ride with Ferraro, his new District Sales Manager reported strong suspicions that Ferraro was selling compounded pain creams for another company while conducting Insys business. On this date, the District Sales Manager also reported that she wanted to place Ferraro on a Performance Improvement Plan ("PIP") due to his disappointing sales results.

35.     On or about the following Monday (April 13, 2015), the District Sales Manager called Ferraro to discuss Ferraro's involvement in the outside company, as well

as his poor performance. Ferraro repeatedly denied any continuing involvement with the outside company but acknowledged that his performance was unsatisfactory.

36.     On April 17, 2015, Ferraro raised with the District Sales Manager for the first time alleged concerns about the Company's sales model and compliance with law. These concerns were obviously not raised in good faith, as Ferraro never raised any concerns prior to the Company confronting Ferraro about his continued and unauthorized involvement in the outside pain cream company (which he denied) and his poor performance (which he admitted) just four days prior.

37.     On April 23, 2015, the District Sales Manager sent a Field Coaching Report ("FCR") to Ferraro.  The FCR was critical of Ferraro in numerous respects. In an email sent later on April 23, 2015 challenging the FCR's findings, Ferraro asserted his purported belief that his District Sales Manager issued the FCR in retaliation for Ferraro's April 17, 2015 communication. Again, it is clear that Ferraro was attempting to insulate himself from the impending termination of employment which would obviously occur once Insys confirmed that he had lied when he said he was no longer selling compounded pain creams.

38.     Indeed, just hours after Ferraro sent his email on April 23, 2015, the Insys Director of Human Resources conclusively received confirmation from the Human Resources Director for the outside company that Ferraro was one of its active employees, with the title Regional Vice President. Based on this confirmation, Insys determined that, notwithstanding his denials, Ferraro was, in fact, working for the outside compounded pain cream company.

10

39.     In short, contrary to Insys policy and Ferraro's non-compete obligations, Ferraro engaged in the outside pain cream business while doing Insys business and on Insys time, while continuing to be paid a salary and quarterly bonuses, and he lied to his direct supervisor about his outside work.

40.     Ferraro exploited his HCP connections which were established using the Insys platform solely during his employment at Insys for his own personal gain. Ferraro specifically targeted the network of TIRF-REMS participating HCPs that Insys had developed, at Insys's significant time and expense, who Ferraro knew could prescribe compounded pain creams based upon his interactions with these HCPs during the scope of his duties at Insys. Compounded pain creams directly compete with Subsys, as compounded pain creams are typically prescribed by the same HCPs that prescribe Subsys and often for the same pain management purposes. Ferraro improperly, and in conflict with the Company's interests and written policies, encouraged those HCPs to prescribe compounded pain creams.

41.     Ferraro's activity violated several company policies, including Policy 110 (Conflict of Interest) and Policy 111 (Outside Employment), Ferraro's contractual obligations under the Offer Statement, the Proprietary Agreement and the Confidentiality Agreement, as well as his common law obligations as a full time employee, agent and fiduciary of Insys.

42.     Upon information and belief, Ferraro earned a significant amount of money in connection with his services to the outside pain cream business.

43.    Ferraro's misconduct has caused and will continue to cause significant disruption to the productivity of Insys's sales force and Insys's relationships with HCPs. Accordingly, Insys terminated Ferraro's employment for Cause on April 23, 2015. Had the Company known of Ferraro's continued misconduct, it would have terminated his employment for Cause sooner.

44.    By acting unethically and contrary to Company policies and his fiduciary duties, Ferraro caused significant, long lasting and perhaps permanent damage to the Company's potentially highly lucrative relationships with the HCPs in his territory.

## FIRST CAUSE OF ACTION
### (Breaches of Contract Against Defendant)

45.    Insys incorporates by reference all preceding and succeeding paragraphs of this Complaint.

46.    Insys and Ferraro entered into a valid and enforceable written Offer Statement on July 3, 2014.

47.    Insys and Ferraro entered into a valid and enforceable written Proprietary Agreement effective August 11, 2014.

48.    Insys and Ferraro entered into a valid and enforceable written Confidentiality Agreement effective August 11, 2014.

49.    On August 11, 2014, Ferraro acknowledged receipt of the Insys Handbook for New Employees and agreed to comply with the policies contained in the handbook.

50.    Insys has fully performed its contractual obligations under the Offer Statement, Proprietary Agreement, Confidentiality Agreement, Company Policy 110 (Conflict of Interest) and Company Policy 111 (Outside Employment).

12

51.     Ferraro materially breached the Offer Statement by soliciting Insys customers using Company resources and during Company time and selling products to Insys customers that directly compete with Subsys in violation of the non-compete provision.

52.     Ferraro materially breached the Proprietary Agreement by unlawfully using Company proprietary information relating to customers and engaging in employment or business activity that conflicted with his employment at the Company without the Company's express written consent.

53.     Ferraro materially breached the Confidentiality Agreement by using confidential information for personal gain, outside the scope of his employment.

54.     Ferraro materially breached Company Policy 110 (Conflict of Interest) by using his Insys position and professional relationships for private gain, which created a conflict of interest that was never disclosed to the Company.

55.     Ferraro materially breached Company Policy 111 (Outside Employment) by failing to obtain written approval before participating in unauthorized outside work activities that prevented him from fully performing work for which he was employed and violated Company policies.

56.     Ferraro's breaches, including those set forth above, proximately caused irreparable injury to Insys.

## SECOND CAUSE OF ACTION
### (Breaches of Fiduciary Duties Against Defendant)

57.     Insys incorporates by reference all preceding and succeeding paragraphs of this Complaint.

58.     Defendant was employed as a key employee and sales trainer by Insys in a position of trust and confidence and was expected to devote his full time and energies to the management and promotion of Insys's business.   He was carefully selected to train newly hired Insys sales representatives. Ferraro owed fiduciary duties to Insys including, but not limited to, a duty of loyalty.   As a fiduciary, Ferraro owed Insys duties of loyalty and good faith, integrity of the strictest kind, fair, honest dealing, and the duty not to conceal matters which might influence his actions to Insys's detriment.   By virtue of these fiduciary duties, Ferraro was prohibited from using his fiduciary relationship to further his personal interests at the expense of Insys, except with the full knowledge and consent of Insys.

59.     The totality of conduct and actions alleged and ascribed to Ferraro during his employment by Insys demonstrates that Ferraro has intentionally, willfully, knowingly, wantonly, recklessly, maliciously, deceptively, fraudulently, in bad faith, and/or in a grossly negligent manner, acted in total disregard of Insys's contractual and other rights and breached the fiduciary duties, including the duty of loyalty, Ferraro owed Insys during such period by, among other things, (a) using Insys's proprietary and confidential information for personal gain, (b) using the professional relationships he had developed with HCPs while employed by Insys for personal gain,   and (c) pursuing personal business interests during work time.

60.     Ferraro never disclosed his outside business activities to Insys and never received consent to engage in such activities.

14

61.    As a consequence of Ferraro's intentional breaches of his fiduciary duties, including the duty of loyalty, Insys has and will continue to be injured.

62.    As a consequence of Ferraro's intentional breaches of his fiduciary duties, including the duty of loyalty, Insys is entitled to the disgorgement of all compensation, including salary and incentive bonuses it paid to Ferraro during the periods in which he breached his fiduciary duties, plus interest.

63.    As a consequence of Ferraro's intentional breaches of his fiduciary duties, including the duty of loyalty, Insys is also entitled to the profits earned by Ferraro in connection with unauthorized services provided by Ferraro while employed by Insys.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that the Court:

1.    on the First Cause of Action, find that Defendant willfully breached Company policies and agreements;

2.    on the Second Cause of Action, find that Defendant willfully breached his fiduciary duties to the Company, including his duty of loyalty;

3.    award Plaintiff compensatory damages, compensation disgorgement and profit disgorgement, against Defendant for the wrongful acts alleged herein in an amount to be determined at trial, but not less than $75,000, as well as punitive damages;

4.    order such equitable relief as it deems appropriate and necessary;

5.    order that the Defendant pay interest and Plaintiff's costs of this suit; and

6.    grant Plaintiff such further and different relief as the Court may deem just and proper.

Date: May 8, 2015                    Respectfully submitted,

David. E. Schwartz
David.Schwartz@skadden.com
Risa M. Salins
Risa.Salins@skadden.com
SKADDEN, ARPS, SLATE,
 MEAGHER & FLOM LLP
Four Times Square
New York, NY 10036
Telephone: 212.735.3000
Facsimile: 212.735.2000

Attorneys for Plaintiff